## AFFIDAVIT

I, Shawna McCann, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence of Kennedy Omboga identified as 253 NW KESSLER, Apt. 307, LEE'S SUMMIT, MO, located within the Western District of Missouri, hereinafter the "**Subject Premises**," further described in Attachment A, for the things described in Attachment B.

2.      I am employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since September 2017.  I am currently assigned to the Seattle Field Division where I am a member of the violent crime, gang, and Transnational Organized Crime—Western Hemisphere squad.   In this capacity, I investigate, *inter alia*, violations of 21 U.S.C. § 801 et seq. (the Controlled Substances Act), and related offenses.  I have received specialized training in the enforcement and investigation of the Controlled Substances Act.  I have received over 400 hours of classroom training including, but not limited to, drug identification, drug interdiction, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, manufacturing, and trafficking of controlled substances.

3.      In my role as a Special Agent for the FBI, I have participated in controlled substances investigations (*e.g.*, heroin, cocaine, fentanyl, marijuana, and methamphetamine) that have resulted in the arrest of individuals and the seizure of illicit drugs and/or drug-related

evidence and the forfeiture of drug-related assets. I have been involved in the service of federal and state search warrants as part of these investigations. I have encountered and have become familiar with various tools, methods, trends, paraphernalia, and related articles utilized by various traffickers in their efforts to import, export, conceal, and distribute controlled substances. I am also familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations, and how they code their conversations to disguise their unlawful activities. I am also familiar with the various methods of packaging, delivering, transferring, and laundering drug proceeds. Additionally, through my training and experience, I can identify illegal drugs by sight, odor, and texture.

4.      I have also worked on drug investigations involving the use of court-authorized wiretaps under Title III. In that capacity, I have had the opportunity to monitor, listen to, and review transcripts and line sheets (prepared by linguists) documenting the content of hundreds of intercepted conversations involving the trafficking of cocaine, methamphetamine, heroin, and other controlled substances, by persons who used some form of code to attempt to thwart law enforcement detection. I have also interviewed defendants at the time of their arrest and have debriefed, spoken with, and/or interviewed numerous drug dealers or confidential sources (informants) at proffer and field interviews who were experienced in speaking in coded conversation over the telephone. From these interviews, and also from discussions with other experienced agents, I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by drug traffickers in the course of their criminal activities, including their use of firearms to protect their narcotics-related activities and of cellular telephones and other electronic means to facilitate communications while avoiding law enforcement scrutiny.

2

5. I have written affidavits in support of court-authorized federal warrants and orders in the Western District of Washington for GPS tracking of telephones, Pen Register/Trap and Trace, and search warrants. Additionally, I have testified in grand jury proceedings, written investigative reports, and conducted and participated in numerous interviews of drug traffickers of various roles within drug organizations, which has provided me with a greater understanding of the methods by which drug trafficking organizations operate.

6. I am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, violations of the Controlled Substances Act, and related offenses.

7. The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement personnel; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the Application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit these offenses in violation of 21 U.S.C. § 846; laundering of monetary instruments in violation of 18 U.S.C. §§ 1956 and 1957, and conspiracy to commit the same; use of a communications facility to commit, facilitate, or

3

further acts which constitute a felony drug offense in violation of 21 U.S.C. § 843(b); interstate and foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity, in violation of 18 U.S.C. § 1952 and 21 U.S.C. § 952; transportation for prostitution, in violation of 18 U.S.C. § 2421; and coercion and enticement of interstate or foreign prostitution, in violation of 18 U.S.C. § 2422 (collectively, the "Target Offenses") have been committed, are being committed, and will be committed by Marquis Jackson, Markell Jackson (the younger brother of Marquis Jackson), Keondre Jackson, Mandel Jackson, Miracle Jackson, Tyrell Lewis, Kennedy Omboga, and other members of the Marquis Jackson Drug Trafficking Organization ("the Jackson DTO").[1] There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

9.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Overview of the Affidavit Supporting Application for Search Warrant

10.     Due to the length of the underlying investigation that involves multiple agencies, jurisdictions, and related suspects, I have attempted to structure this Affidavit in Support of An Application Under Rule 41 for a Warrant to Search and Seize as follows: I will first introduce the underlying investigation and the individuals under investigation. I will then show how each

---

[1] This DTO is a family-gang based DTO, in that the majority of the members of the DTO are family members of one another and many of them are also associated with the 44 Holly Crip gang.

relevant member of the organization is involved in the Target Offenses and their respective roles in the organization. I will then show how this organization uses female couriers and/or prostitutes, including Kennedy Omboga, to transport controlled substances and drug/prostitution proceeds and to occupy stash locations across the country, including in Lee's Summit, MO at the **Subject Premises**. Finally, I will identify the evidence that tends to show that the organization has used the **Subject Premises** as a stash location on at least two separate occasions.

### *Background of the Investigation*

11.    The United States, including the FBI and the Seattle Police Department, is conducting a criminal investigation of a regional DTO that is supplied primarily by sources outside the State of Washington regarding possible violations of the Target Offenses. Investigators are referring to this regional DTO, to include its out-of-state suppliers, as "the Jackson DTO" and have identified Marquis Jackson and Markell Jackson as prominent members of the DTO.

12.    The investigation into the Jackson DTO began in early 2022 and has identified that the Jackson DTO is affiliated with a local Seattle street gang known as "44 Holly," which is a subset of the Crips gang. Law enforcement officials identified public social media posts of Marquis Jackson that depict images of large quantities of unexplained cash and other indicators of drug trafficking activity. Further, according to an October 2022 Phoenix Police Department report, law enforcement officers arrested Marquis Jackson for possessing a stolen vehicle. During that arrest, officers discovered that Marquis Jackson had three iPhones, $10,100 in cash, a gold and diamond Rolex watch, and a gold and diamond necklace in his possession. Law enforcement officials also found a stolen firearm in the rear seat. Based on my training and

5

experience, I know that such large amounts of cash and valuables along with possessing multiple cell phones and a firearm are all consistent with drug trafficking. Illicit drug users commonly possess multiple phones is a common tactic utilized by drug traffickers to avoid detection from law enforcement. Drug dealers also commonly have firearms as they are commonly targeted for robberies because the frequently possess valuable controlled substances and substantial amounts of illicit drug proceeds.

### *Markell Jackson Sold Fentanyl to a Confidential Informant and an Undercover Agent Using Multiple Different Telephones*

13. In mid-October 2023, a confidential informant (CS3) advised investigators that Markell Jackson, who CS3[2] only knew by the moniker "Chapo," contacted CS3 via phone number (425) 953-9277 (TT11)[3] and offered to sell CS3 fentanyl pills.

14. From late October 2023 to March 2024, investigators conducted controlled purchases of fentanyl-laced pills ranging from 2,000 pills to 5,000 pills from Markell Jackson and his runners, Adean Batinga and Robert Johnson, first using CS3 and then an undercover agent posing as a drug customer from Canada whom CS3 was able to introduce to Markell Jackson. The UC communicated with Markell Jackson on multiple different phone numbers during this time to arrange and conduct controlled purchases of fentanyl pills, including phone

---

[2] CS3 is a paid confidential source with DEA and the Whatcom Gang and Drug Task Force. CS3 has provided credible and reliable information, which has been corroborated, both during other investigations and during this investigation. CS3 has felony convictions for burglary and theft, which were over twenty years ago. CS3 has a recent deferred misdemeanor theft conviction, which was deferred in 2019. CS3 has other misdemeanor convictions, the most recent of which was over fifteen years ago. CS3's identity is not being disclosed in this application to protect CS3's safety.

[3] "TT" refers to Target Telephone.

6

number (206) 468-4885 (TT9). These controlled purchases of narcotics further confirmed CS3's reporting that Markell Jackson is working as part of the Marquis Jackson DTO to traffic fentanyl pills and established a trend of the DTO using multiple cell phones at a time.

### Title III Wiretap Intercepts Discussing Drug Trafficking with Markell Jackson and Arizona Supplier Edgar Valdez

15.     On June 10, 2024, the Honorable Judge Chun, United States District Court for the Western District of Washington, issued a Title III order for the interception of wire and electronic communications for TT9, used by Markell Jackson, and the interception of wire communications for phone number 206-939-8627 (TT16), used by Adean Batinga—one of Markell Jackson's runners.  Interception of TT9 and TT16 terminated on July 9, 2024.

16.     On or about June 13, 2024, investigators intercepted Markell Jackson using TT9 communicating with one of his suspected prostitutes, De'ere Thornton at phone number (510) 867-8220.  During this conversation, Thornton thought Markell Jackson was going to "AZ [Arizona]."  Markell Jackson told Thornton that he was going to "get the rest of my cake [drug proceeds] that I was waiting on.  I had fronted a N***"… "I'm about to go pick that up, and then come to you pick that up [prostitution proceeds], then boom, head to AZ and reup." (Session 331).  Based on my training and experience, I know that "fronting" is when a drug supplier provides a redistributor drugs with the promise that the redistributor will pay the supplier back at a later date.  I also know that "reup" refers to a drug supplier resupplying his stash of drugs.  Thus, I believe Markell Jackson was discussing that he was collecting money [cake] from a redistributor who owed him money based on drugs that Markell had previously "fronted" to the redistributor, and that Markell would then come and pick up Thornton before heading to Arizona

7

to resupply his stash of narcotics before returning to Seattle. Accordingly, I believe Markell Jackson's supplier is in Arizona, and that Markell Jackson collects both illicit drug proceeds and prostitution proceeds in order to use those proceeds to purchase more narcotics.

17.     On or about June 24, 2024, investigators intercepted an outgoing call from Markell Jackson at TT9 to Edgar Valdez using phone number (602) 715-6825 (TT23).[4] Markell Jackson said, "Hola amigo, it's King's little brother," and then the call disconnected. (Session 1697). After this call, Markell Jackson used TT9 to text Valdez at TT23 the following text message conversation:

TT9: Hola

TT9: King [Marquis Jackson] little brother

TT9: meet for lunch tmrw?

TT23: Yes ppi

TT9: Ok [emoji] 150 [150,000 pills]

TT23: what time?

18.     Based on my training and experience, I believe Markell Jackson contacted Valdez at TT23, who investigators believe is likely Marquis and Markell Jackson's controlled substances supplier, based on the phone number area code in the Phoenix area and the context of the intercepted communications with Valdez and with other DTO members where Markell Jackson discussed travelling to Arizona to get resupplied. and meet his "plug." I know that a

---

[4] Investigators identified Edgar Valdez as the user of TT23 based on obtaining GPS location data for TT23 and observing a male matching the driver's license photograph of Edgar Valdez in the vicinity of the location data at several different locations and times.

8

"plug" refers to a drug supplier. From this investigation, I know that street names for Marquis Jackson are "Bounce," "BounceOut," and "King." Thus, I believe that Marquis Jackson was the supplier's initial point of contact, and that Markell Jackson was texting with Valdez to arrange to meet Valdez the following day in Arizona to get resupplied with 150,000 narcotics pills.

19.     Following this call and texts with Valdez at TT23, investigators intercepted Markell Jackson using TT9 talking with the Jackson DTO runner/co-conspirator Terrique Milam at phone number (206) 475-2800 (TT19).[5] During this call, Markell Jackson told Milam that he was about to hop on a flight that night [to Arizona] and that his "plug" was not going to want to meet until tomorrow and that Markell Jackson just texted him. Markell Jackson also told Milam that Bounce's little brother stayed at Bounce's spot in Arizona to meet with the "plug." (Session 1710). Based on my training and experience, I believe this call confirms that Markell Jackson was just texting with his/Marquis Jackson's drug supplier, Valdez at TT23, and that Markell Jackson was going to fly to Arizona that night to meet with UM6825 the following afternoon to get resupplied with narcotics.

20.     On June 24, 2024, Magistrate Judge Brian Tsuchida signed a warrant authorizing the issuance of a pen trap and trap and trace on TT23 and the collection of prospective GPS location data. According to GPS location data from TT9, Markell Jackson flew to Arizona on or about June 26, 2024. Intercepted communications between Markell and the suspected supplier,

---

[5] Investigators have identified the user of TT19 as Sir Terrique Milam based on intercepted communications identifying the user of TT19 as "Sir Terrique" and "Sir Terrique Milam," as well as physical surveillance observing Sir Terrique Milam, identified based on a comparison to his driver's license photograph, in the vicinity of GPS location data for TT19. (Session 240, 970).

using TT23, show that they have made several attempts to meet up for the proposed drug deal, but multiple attempts failed before Markell Jackson eventually flew back to Washington.

***Intercepted Calls Indicate that the Jackson DTO is also Involved in Interstate Prostitution***

21.     On June 18, 2024, Magistrate Judge Paula L. McCandlis, Western District of Washington, signed a warrant authorizing the prospective location data for cellular phone (816) 572-2267 (TT20) being used by Kennedy Omboga.  Investigators believe Kennedy Omboga is the user of TT20 based on text messages between TT20 and Markell Jackson in which the user of TT20 identified herself as Kennedy Omboga, as set forth below in paragraph 51. Investigators intercepted multiple conversations between Markell Jackson and Omboga where they discussed the ongoing prostitution of Omboga.  During these conversations, GPS and cell site information GPS and cell cite information for TT9 placed Markell near Seattle, Washington and GPS and cell cite information for Omboga placed her near Kansas City, Missouri.  Thus, I believe that Markell Jackson's involvement in the promotion of prostitution extends outside of Washington.

22.     On or about June 13, 2024, TT9 received a call from De're Thornton at (510) 867-8220 [session 330] involving the promotion of prostitution.  During this call, Markell Jackson asked Thornton if she was in Minnesota, to which she replied no and said that she was in Wisconsin.  Thornton told Markell that she was concerned that the night before, several people had been calling and texting her and sending "fake, um, verifications, like Google Meets and shit, so I stopped replying to some people and I just been fuckin' with this um one n**** that, he been [unintelligible] and shit.  He been givin' his money.  So I just been fuckin' with that."  I know from my training and experience that prostitutes commonly use a mechanism for verifying

their customers before providing services both for their own safety as well as identifying the customer to ensure they pay for the prostitute's services. Thus, in this call, I believe that Thornton explained to Markell that she was explaining to Markell why she was providing prostitution services to only one customer. Markell then asked Thornton if her work had picked up or was still slow, which indicates that Markell is aware of the day-to-day pace of Thornton's prostitution activities. During the call, Thornton told Markell during this call that she was presently in Wisconsin and would be taking a Greyhound bus to Minnesota in about four hours and that she had secured a double room. At the time of this call, GPS and cell phone location data placed Markell in the greater Seattle area in Washington while Thornton indicated that she was participating in prostitution-related activities in both Wisconsin and soon in Minnesota. Thus, I believe that Markell is engaging in the promotion of prostitution across state lines by directing female sex workers to travel into different states to engage in prostitution. In other words, I believe that Markell is engaged in the promotion of interstate prostitution in violation of federal law.

### Intercepted Communications Regarding Marquis Jackson's Drug Trafficking and Seizure of 100,000 Fentanyl Pills

23. On August 5, 2024, the Honorable Judge King, United States District Court for the Western District of Washington, issued a Title III order for the interception of wire and electronic communications for TT23, used by Edgar Valdez, TT19 used by Terrique Milam, and

phone number (206) 883-0376 (TT18)[6] used by Mandel Jackson (Marquis and Markell Jackson's father). Interceptions of TT23, TT19, and TT18 ended per the terms of the court's order on September 3, 2024.

24. On or about August 9, 2024, Marquis Jackson using phone number (945) 261-7501 (TT28)[7] communicated with Phoenix-based DTO drug supplier Edgar Valdez at phone number (602) 715-6825 (TT23) and advised Valdez that he would be ready at 8[p.m.] and needed "200." (Sessions 87-88). Based on my training and experience, I believe Marquis Jackson advised Valdez that his courier would be ready to meet with Valdez at 8:00 p.m. that evening to conduct the deal for 200,000 fentanyl-laced pills. At approximately 7:12 p.m., investigators intercepted a text from Marquis Jackson using TT28 to Valdez (Session 99). The text read: Can you show me the ones you got? At approximately 7:16 p.m., investigators intercepted a text message from Valdez to Marquis Jackson at TT28 (Session 100). The text read: If I want to bring you a sample before I take you the 200. At approximately 7:48 p.m., investigators intercepted a text message from Marquis Jackson using TT28 to Valdez (Session 113). The text read: Send me picture. At approximately 7:52 p.m., investigators intercepted a text message from Marquis Jackson using TT28 to Valdez (Session 120). The text read: You test them already? At approximately 7:53 p.m., investigators intercepted an MMS message from Valdez to

___

[6] Investigators have identified the user of TT18 as Mandel Jackson based on intercepted communications over TT18 identifying the user as "Mandel," as well as physical surveillance observing Mandel Jackson, identified based on a comparison to his driver's license photograph, in the vicinity of GPS location data for TT18. (Session 1768, 1817).

[7] Investigators believe Marquis Jackson is the user of TT28 based on a voice comparison to known jail calls of Marquis Jackson and prior interceptions of Marquis Jackson in this investigation, context of the calls where Marquis refers to Mandel as "dad," and common caller analysis.

Marquis Jackson at TT28. The message was two pictures of an open hand. The hand had small blue pills in the palm. At approximately 8:10 p.m., investigators intercepted a message from Valdez to Marquis Jackson at TT28 (Session 125). The message read: Good? At approximately 8:17 p.m., investigators intercepted a text message from Marquis Jackson using TT28 to Valdez. The text read: Yes.

26. At approximately 8:18 p.m., investigators intercepted back-to-back text messages from Marquis Jackson using TT28 to Valdez (Sessions 127 and 128). The first message read: Meet here. The second message had a map link to the Marriott at the Phoenix Airport. At approximately 10:02 p.m., agents on physical surveillance observed a black Porsche Panamera bearing Arizona license plate number B9A02R pull into the lot. The vehicle is registered to Miracle Jackson. A male, later identified as Tyrell Lewis, got out of the driver's seat. Lewis helped a small child out of the vehicle. They then went inside the hotel. Later that evening, agents approached hotel management and obtained information reflecting that Miracle Jackson had rented a room at the hotel, using her father Mandel Jackson's Marriott's rewards number and her mother's Matelita Jackson's email address.

26. At approximately 10:13 p.m., investigators intercepted a text message from Valdez to Marquis Jackson at TT28. The text read: I'm on my way. At approximately 10:26 p.m., investigators intercepted a text message from Marquis Jackson at TT28 to Valdez (Session 212). The message read: Black Porsche. At approximately 10:45 p.m., agents on physical surveillance observed Valdez drive into the parking lot of the Marriott. At approximately 10:45 p.m., investigators intercepted a phone call from Valdez to Marquis Jackson at TT28. Valdez told Marquis Jackson he was there. Marquis Jackson asked him if he saw the black Porsche.

13

Agents on surveillance observed the Porsche then pull out and drive around the back of the hotel. Valdez followed the Porsche. Both vehicles were out of view of surveillance. At approximately 10:56 p.m., investigators intercepted a text message from Valdez to Marquis Jackson at TT28 (Session 215). The text read: I gave him the sample painting. Based on my training and experience, I believe Marquis Jackson directed Valdez to meet with his couriers, his sister Miracle Jackson and Tyrell Lewis to conduct the narcotics deal for the sample of the fentanyl-laced pills. I know that "paint" is a common code word used for narcotics.

27.　　Later that same evening and into the next day, investigators intercepted a text message to Valdez at TT23 from phone number (405) 227-0816 (TT32) that read: Papi call me new number. (Session 220). Based on the context of the ensuing conversation between the user of TT32, Marquis Jackson at TT28, and Valdez at TT23, as follows, investigators believe the user of TT32 is Marquis Jackson and that TT32 is a second phone used by Marquis Jackson.

TT32: you didn't give my sister [Miracle] any work [drugs]? (Session 224)

TT32: That's all [the money/valuables] I had papi (Session 225)

TT23: Papi, why didn't you send me the Cartier [a luxury watch]? (Session 235)

TT23: I need to check those watches (Session 236)

TT32: You can check at capri jewelers were [sic] I bought them (Session 237)

[***]

TT32: I really need work my people need 300 [300,000 pills] out here they have cash ready but won't give it to me without product. (Session 244)

TT32: I'll give you what I got I have no more money rn I gave all I had (Session 246)

TT32: Am [sic] I have my Porsche (Session 248)

14

TT32: Whatever it takes (Session 249)

[***]

TT28: Let me know after you check the watches papi (Session 251)

TT23: Did you review the sample I left you? (Session 255)

TT28: Yes they are good are they all like that? (Session 256)

28.     Following the deal on August 9, 2024, at approximately 11:16 p.m., investigators intercepted a call from Marquis Jackson using TT32 to Mandel Jackson, his father, at phone number (206) 883-0376 (TT18).  (Session 326).  During this call, Marquis Jackson complained that Mandel's daughter [Miracle] got him "hit" again because she gave the plug his two watches and all his money for a boat.  Marquis Jackson said he was trying to call her during the deal, but she hopped out the car before he could get a hold of her.  Mandel Jackson asked why Marquis Jackson did not have "Tyrell" do the deal, and Marquis Jackson stated that Tyrell was in the car with her.  Mandel Jackson asked how much cheese he gave her, and Marquis Jackson said he gave her "like 50" and the plug was supposed to give him "2."

29.     Based on my training and experience, I believe Marquis Jackson had his sister, Miracle Jackson (accompanied by Tyrell Lewis), conduct the deal with Valdez on Marquis's behalf but Miracle made an error and gave Valdez all of Marquis Jackson's narcotics money and his two watches for the sample of 1,000 pills instead of for the full narcotics planned amount of 200,000 pills.  I believe Miracle Jackson gave Valdez $50,000 and two of Marquis Jackson's watches.  I know that the term "boat" is a common street term for 1,000 pills.  I know that the term "work" is a common street term for narcotics.  I believe that Valdez wanted to have the watches appraised before giving Marquis Jackson the full narcotics amount.

15

30.     On or about August 10, 2024, investigators intercepted the following text message conversation between Marquis Jackson at TT28 to Edgar Valdez at TT23 (Session 261):

TT28: Can you bring them?

TT28: You were supposed to bring yesterday

TT23: 1 hour in the same place?

31.     Approximately one hour after the message above, investigators intercepted a phone call from Marquis Jackson at TT28 to Mandel Jackson at TT18 (Session 402) discussing the pending fentanyl pill transaction as follows:

TT28: Dad, call your dumbass, retarded ass daughter and tell her to quit fucking playing. The plug is trying to meet up with her and meet her at the Marriott. [Unintelligible] is getting lashes, talking about "Oh, am I supposed to be picking up "tee three" and taking him somewhere?  Is that something you needed me to do?" [Mimicking speech]…Bitch, I didn't tell you to do nothing to do [sic] for no nuts n**** I told you to go to fucking Marriott and wait for the plug to get there and pick up my shit.

[***]

TT28: [overlapping] she's acting slow, dad, you know I know, I deal with bitches all day, every day.  She's been acting slow since we left Miami.

TT18: Yeah, that's crazy.  She getting her eyelashes up.  Let me call her and see what the fuck's going on. She supposed to be going [unintelligible.]

[***]

16

TT28: Tell her to answer the phone and tell her to be at the airport [unintelligible] Marriott right this fucking second and pick up my, I don't even want her dumbass to do that, but she's the only one with a fucking car out there.

[***]

TT28: I'm saying go to the Marriott, the plug's going to be there. When I get there pick up the bag, wait there, and then I'm going to have, you're going to have to drop it off. She's going to have to drop it off, she has the Porsche. ***She's going to have to drop it off to my, my stash spot [emphasis added].***

32.     During this conversation, I believe Marquis Jackson used TT28 to talk to Mandel Jackson at TT18 about Marquis's specific instructions to his sister, Miracle Jackson, regarding meeting with his narcotics supplier [plug] at the Marriott hotel, picking up Marquis's shit [controlled substances], and driving the Porsche to deliver the drugs to Marquis's stash location. Marquis confirmed that Miracle was with him in Miami recently and Mandel told Marquis that he would call Miracle and see what was going on.

33.     Within minutes, investigators intercepted a phone call from Mandel Jackson at TT18 to Miracle Jackson at phone number (206) 883-0314 (TT33)[8] (Session 404), during which they discussed what is going on between her and Marquis Jackson. Mandel told Miracle to "take care of business." I know, based on my training and experience, that "business" is a common

---

[8] Financial records show that on June 17, 2023, Miracle Patu-Jackson purchased a 2015 Porsche Panamera from AZ Luxury Auto Group Inc in Phoenix, Arizona. She made a $5,000 down payment and financed $28,373.57 with Lobel Financial. On the application for credit, Patu-Jackson listed an address of 11810 56th S Place, Seattle, with a phone number of (206) 883-0314 (TT33).

street term for conducting illicit drug transactions. At some point, an unidentified male co-located with Miracle, believed to be Tyrell Lewis, got on the phone and spoke to Mandel about Miracle and Marquis.

34.     At approximately 8:05 p.m., investigators intercepted a text message from Edgar Valdez at TT23 to Marquis Jackson at TT28 (Session 326), which read, "I'm here." A couple of minutes later, investigators intercepted a phone call from Valdez at TT23 to Marquis at TT28 (Session 327), during which Marquis told Valdez that his sister was coming down. Around this time, investigators inside the hotel observed Miracle and Tyrell exit the rear door of the hotel headed in the direction of a black Porsche registered to Miracle. Around this same time, investigators observed a silver or gray-colored sedan enter the parking lot of the hotel and drive around toward the back of the parking lot. Investigators were unable to observe the license plate due to darkness and were unable to get close enough to the location of the Porsche without arousing suspicion to observe the transaction directly. At approximately 8:12 p.m., GPS data put Valdez (TT23) within range of the Marriott hotel. At approximately 8:15 p.m., surveillance personnel observed the same sedan and the Porsche drive through the parking lot and approach the intersection of West Moreland Ave and 44th Ave. The sedan departed the area, but the Porsche waited at this intersection for several minutes before turning around and returning to the hotel parking lot. Investigators observed Miracle Jackson and Tyrell Lewis exit the vehicle and go into the hotel where they took the elevator to the sixth floor. Investigators inside the hotel observed that Miracle had a handbag with her, and Tyrell was rolling a black roller bag that they had not had in their possession when they left the hotel.

18

35.     At approximately 8:30 p.m., investigators intercepted two text messages from Marquis Jackson at TT28 to Edgar Valdez at TT23. Marquis told Valdez, "Thats only 100 papi" (session 329), and, "I need 2" (session 330). I believe, based on my training and experience, that Marquis Jackson told Edgar Valdez that Valdez had only provided 100,000 fentanyl pills and Marquis needed 200,000 pills. At approximately 8:43 p.m., investigators observed Miracle and Tyrell leave the hotel lobby through the rear door with the black roller bag, get into the Porsche, and depart the parking lot. Investigators followed the Porsche away and officers of the Phoenix Police Department (PPD) executed a traffic stop along the freeway a couple of miles away from the hotel at approximately 8:50 p.m. During the stop, the female in the front passenger seat showed her driver's license to officers and she was identified as Miracle Patu-Jackson. The black male driver did not have any identification and was transported by officers to a nearby station for fingerprinting before being released. The male was identified as Tyrell Lewis. PPD officers transported Miracle to a nearby location away from the side of the freeway for her safety before impounding the vehicle according to their department policy.

36.     Phoenix Police Department officers working with FBI agents conducted a probable cause search of the Porsche and located the black roller bag, which was seized by FBI investigators and was found to contain approximately 100,000 blue pills marked M30, confirmed to contain fentanyl by the DEA lab.

***Historical SMS Content and Intercepted Communication Showing Keondre Jackson is a Member of the Jackson DTO.***

37.     Investigators analyzed call data records from May 5, 2024, to June 19, 2024, and noticed that the user of phone number (602) 290-0918 (TT21) was in frequent contact with

known associates of Marquis Jackson and the Marquis Jackson DTO. Between April 4, 2024, and May 8, 2024, TT21 had three phone contacts with telephone number (214) 535-9655, which officers observed Jackson DTO runner Harold Butler[9] using during an undercover controlled purchase of approximately 1,000 fentanyl pills from Butler by law enforcement in St. Charles, Missouri on June 18, 2024. From May 5, 2024, to June 19, 2024, TT21 contacted (206) 751-4512 (TT35) sixteen times. Investigators have identified the user of TT35 as Star Isha Williams, based on a financial investigation and GPS location data for TT35 placing the device in the vicinity of a known apartment for Williams. As set forth based on intercepted communications between Mandel Jackson and Marquis Jackson discussed below, Marquis Jackson told Mandel that he instructed Miracle to take the pills to Star's prior to the interdiction stop discussed above. Accordingly, investigators believe Star Williams is a Phoenix stash house sitter for the Jackson DTO. Additionally, for reasons discussed below, investigators believe Star Williams is one of Marquis Jackson's girlfriends.

38.     Agents served a subpoena on Apple seeking account information associated with TT21. From Apple's response, agents identified an iCloud account associated with TT21 and email address keondre.jackson24@gmail.com, confirming Keondre Jackson was the user of TT21.

---

[9] Based on an interdiction stop of Harold Butler and a female associate by DEA Kansas City/Wichita on or about July 17, 2024 that seized Butler's phone, approximately 80,000 suspected fentanyl pills, and approximately two kilograms of white powder (suspected cocaine or fentanyl), investigators subsequently reviewed the contents of Butler's phone pursuant to a search warrant and identified Harold Butler as the likely father of Keondre Jackson and uncle to Marquis Jackson and Markell Jackson.

20

39.     On July 9, 2024, the Honorable Magistrate Judge Michelle L. Peterson issued a search warrant for historical SMS content and other historical location data for TT21.  On July 16, 2024, Verizon produced historical SMS content records in response to this search warrant. Investigators reviewed the historical SMS content for TT21 and observed several text messages indicative of drug trafficking.  For example, on June 15, 2024, Keondre Jackson using TT21 exchanged the following text messages with Phoenix-based Jackson DTO drug supplier Edgar Valdez at (602) 715-6825:

| From: | To: | Message: |
|---|---|---|
| (602) 715-6825 | (602) 290-0918 (TT21) | "red jeep" |
| (602) 715-6825 | (602) 290-0918 (TT21) | "[$]58400" |
| (602) 290-0918 (TT21) | (602) 715-6825 | "Yes sir" |
| (602) 290-0918 (TT21) | (602) 715-6825 | "Thank you papi" |
| (602) 715-6825 | (602) 290-0918 (TT21) | "I'm here" |
| (602) 290-0918 (TT21) | (602) 715-6825 | "Missing 20k [pills] papi" |
| (602) 290-0918 (TT21) | (602) 715-6825 | "And one [bag] is no good" |
| (602) 290-0918 (TT21) | (602) 715-6825 | "Papi these are no good [not good quality]" |
| (602) 290-0918 (TT21) | (602) 715-6825 | "Can you come back" |
| (602) 715-6825 | (602) 290-0918 (TT21) | "because they are bad daddy" |
| (602) 290-0918 (TT21) | (602) 715-6825 | "I know papi but they are bad like the last time" |

| (602) 715-6825 | (602) 290-0918 (TT21) | "Papi" |
|---|---|---|
| (602) 290-0918 (TT21) | (602) 715-6825 | "I just want the money back papi this is bad work [drugs]" |

40.    Based on my training and experience, I believe Keondre Jackson met with Valdez to conduct a drug transaction and that Keondre Jackson received poor quality of drugs from Valdez that was short 20,000 narcotics pills.  I know that "work" is common slang for drugs and the term "no good" is often used by drug traffickers to indicate the drugs received were poor quality.  I believe that Keondre Jackson was requesting his money back from Valdez because the drugs Valdez supplied were poor quality.

***Intercepted Communications and iCloud Information Showing Kennedy Omboga is a Drug Courier and Prostitute for the Jackson DTO who Lives at the Subject Premises.***

41.    On June 12, 2024, Markell Jackson received a call on TT9 from Kennedy Omboga at (816) 572-2267 (TT20) discussing finding another female to work as a prostitute for Markell as follows:

TT20: Daddy, I forgot to tell you I need one of you to grab another "brother."

TT9: Hmm?

TT20: Unless your brother wants another bitch, cause I got another bitch she said she with it.

TT9: What she look like? Or how old is she?

TT20: She's like 21, 22. Hold on

TT9: Call him

22

TT20: I'm about to send you her IG too. Her name, uh, Bri

TT9: Send me that shit.

TT20: You got the one, oh wait she ain't even got shit on here. You got the [unintelligible]?

TT9: You say I got the what?

TT20: I say you got the video. I'm about to tell her to send me some more videos cause she don't got nothing on her Instagram. Alright, I love you.

42.     During this call, I believe Omboga told Markell Jackson that she recruited a female aged 21 or 22-year-old named "Bri" who was willing to work as a prostitute for the Jackson DTO. Omboga then sent videos of Bri from Bri's Instagram account to Markell to evaluate and said she would reach out to get more videos.

43.     On June 13, 2024, Markell Jackson used TT9 to call Kennedy Omboga at TT20 to discuss prostitution proceeds as follows:

TT20: Hello?

TT9: Hey, you still trying to get your hair done?

TT20: You said what?

TT9: You still trying to get your hair done?

TT20: Yeah, I been. Um, it's only one ten.

TT9: Just take it from your stack. [unintelligible] have some money.

TT20: Aw, thanks, babe.

TT9: [unintelligible]

23

TT20: [unintelligible]. Ask you for a lot. Thanks daddy, I appreciate it. I'll make some more money for ya. I'll let you know.

44.     I believe that Markell Jackson asked Omboga if she was going to a hair stylist, to which Omboga responded that she had already gone, and that it had cost $110. Markell told Omboga to "take it out of her stack," which I know from my training and experience to mean that she can subtract that $110 from the amount of money she is expected to earn for him through prostitution. Omboga was very grateful for the money and told Markell that she will make some more money for him through prostitution. I believe this demonstrates that Omboga holds onto Markell Jackson's prostitution proceeds at her residence, identified below as the **Subject Premises.**

45.     On June 17, 2024, investigators intercepted communications between Markell Jackson (TT9) and Kennedy Omboga (TT20) where Omboga said she is about to put "his [Markell's] money" with the other money and "lock it up." Markell told Omboga to count it all up and then text him. (Session 762). Because both parties have iPhones, investigators never intercepted iMessage text messages between them, due to end-to-end encryption. Again, I believe these communications demonstrate that Omboga holds onto Markell Jackson's prostitution proceeds at her residence, identified below as the **Subject Premises.**

46.     On June 22, 2024, investigators intercepted communications between Markell Jackson (TT9) and Omboga (TT20) where Markell told Omboga to count 250 bills individually, separate it, and bring me 250, and get ready to go to the club. (Session 1504). Again, I believe this demonstrates that Omboga holds onto Markell Jackson's prostitution proceeds at her residence, identified below as the **Subject Premises.**

24

47.    On July 4, 2024, investigators intercepted a call between Markell Jackson (TT9) and Kennedy Omboga (TT20) where Omboga said she deposited some of the money in the ATM, but it kept spitting 500 back at her. Kennedy discussed going to another ATM to depositing the "other 5 [$500]." Omboga confirmed she deposited "8 [$800 or $8,000]." (Session 2998). Based on my training and experience, I believe Omboga was depositing cash prostitution proceeds into a bank account in order to route the money to Markell Jackson.

48.    In a series of intercepted calls on July 5, 2024, Markell Jackson at TT9 and Kennedy Omboga using TT20 discussed the price she will charge for a male client who wanted "an overnight" session with her. Omboga suggested $1,600 but expressed concerns because the client was white. Markell Jackson told her to proceed with the appointment, and they discussed how long the overnight should be, arriving at five hours. (Session 3027, 3028).

49.    On July 19, 2024, FBI Seattle investigators obtained a search warrant from the Western District of Washington for content stored on the iCloud account for Markell Jackson associated with TT9. Investigators reviewed the records provided by Apple for Markell Jackson's iCloud account and observed several text message exchanges between Markell Jackson using TT9 and Kennedy Omboga using TT20.  These text exchanges are indicative of money laundering, drug trafficking, and interstate prostitution activities for the Jackson DTO. Examples of these communications are below.

50.    On April 29, 2024, Omboga using TT20 texted a photograph of stacks of cash to Markell at TT9, which I believe was Omboga providing proof of the interstate prostitution proceeds she was earning for Markell Jackson, her pimp, and likely storing at her residence, the **Subject Premises.**

51.     On April 30, 2024, investigators observed text messages from Omboga using TT20 discussing renting a hotel room for Markell Jackson's visit to Kansas City. Omboga (using TT20) identified herself in the text messages by telling Markell Jackson the hotel room was booked under "omboga" before correcting that to "keyona brown." On May 2, 2024, Omboga (using TT20) texted a wifi password of "Kennedy87!" to Markell Jackson.

52.     On May 2, 2024, Omboga using TT20 texted Markell: "city girls up." And then the parties discussed how much to charge a wealthy prostitution client from Miami for staying with Omboga for the night, ranging from $2,500 to 5,000, and Omboga texting, "he got money i'm about to tax this n****…. He owns yactcs [sic] out there got like some boating company," to which Markell replied, "7500." Based on my training and experience, I believe Markell Jackson and Omboga arrived at charging this prostitution client from Miami a total of $7,500 to spend the night with Omboga and that Omboga may have posted for her prostitution services on a website referred to as City Girls.

53.     On May 3, 2024, Omboga using TT20 texted Markell Jackson at TT9, "i got the new acc yu jus hv type n chose the flics for me again & it should b verified tn then ima start workin n hv a stack for u b4 u come bk my city." On or about May 4, 2024, Omboga texted provocative pictures of herself to Markell Jackson and asked if he liked them and indicated she was trying to post an advertisement for prostitution services on Mega Personals, but the website rejected her post. Based on my training and experience, I believe Omboga created an account on Mega Personals and was attempting to post an advertisement for her prostitution services that was rejected by the website, and Omboga was asking Markell Jackson for his input on the photographs she posted on the site.

54.     On May 4, 2024, Omboga using TT20 and Markell Jackson using TT9 discussed Omboga picking up a bag at the airport. Markell said, "Check N see if bag is out." Omboga indicated she was having a friend pick up the bag for her and that she got the bag: "i cut shorty some money for grabbin it for me ima call u when I'm home." Afterwards, Omboga texted Markell as she was leaving the airport, "feds is n front of us we can't even speed like wtf." Markell replied, "it's coo don't panic Drive normal." Omboga continued to express concern, "he just flips his lights we straight we bout push it." Markell instructed Omboga to "clear yo phone in case." Omboga later texted Markell, "I made it bk everything coo." Markell told Omboga tom "Check bag make ain't no tracker or muffin…nothun." Omboga replied, "it's straight n both blk bag n der." Based on my training and experience, I believe Markell Jackson instructed Omboga to pick up a checked bag from the Kansas City airport that likely contained controlled substances. I believe Omboga had another individual collect the bag to evade law enforcement detection, that Omboga expressed concern driving with the bag after leaving the airport because of the contents of the bag, likely containing drugs or drug proceeds, and that Markell Jackson had Omboga check to see if there were trackers in the bag to check for law enforcement detection, because previously law enforcement officials had seized  bags from airports and discovered controlled substances in the bags of Markell Jackson and the Jackson DTO had been seized at airports. I believe that when Omboga said she was going to call Markell Jackson when she made it "home" with the collected luggage, that Omboga likely was referring to her residence, **Subject Premises**.  Because I believe she took this specific piece of luggage that likely contained illicit drugs or illicit drug proceeds to her "home," I believe that Omboga uses the **Subject Premises** to store drugs and illicit drug proceeds.

27

55.     Based on my training and experience, I know a common method drug traffickers use to transport controlled substances across state lines is by booking a cheap airline ticket in a courier/runner's name and having the courier/runner go to the departure airport and check a bag containing the controlled substances and leave the airport, with no intention of taking the flight; the drug trafficker then has another courier/runner at the arrival airport collect the luggage. Law enforcement refers to this method of trafficking as utilizing "ghost bags" as they travel via aircraft without a passenger onboard the plane.

56.     On July 7, 2024, investigators intercepted a call (session 3088) between Markell Jackson (TT9) and Terrique Milam at phone number (206) 475-2800 (TT19) in which Markell Jackson discussed a female courier who was bringing drugs from Arizona to Seattle.  During the conversation, they also discussed using female couriers/runners, like Kennedy Omboga, to send ghost bags containing controlled substances.  Here is the pertinent exchange:

> Markell: Brother that shit. She [referring to the runner bringing illicit drugs from Arizona to Seattle] about to hop on a bus at midnight.
>
> Milam: Oh she getting on at midnight.
>
> Markell: at midnight.
>
> Milam: alright bet.
>
> Markell: AZ time, so she get in like 26 hours.
>
> Milam: Alright bet. Hey, I was going to say, bro next time we should do it that one way.
>
> Markell: What through the air drop?
>
> Milam: Yeah just drop it off [check luggage at airport]

Markell: Oh fleek fleek. Yeah that shit be cool only thing is.... [background noise]. Yeah but the only thing about that brother is, it shit be hard because if they [TSA or airlines employees] see that shit on the thing [luggage belt] and they call you on the flight and you aren't on there. You know.

Milam: Oh I see.

Markell: Yeah you going to have to do it like, right after. Like later, trying to catch it. you know.

Milam: Yeah.

Markell: Yeah that shit be working sometimes though. I did it like twice [used ghost bags to traffic controlled substances two times previously].

Milam: I know exactly what you mean.

Markell: And then the bitch [a female runner] check it in, boom, and then just leave it at the airport. You know you have to act like you are fixing to go walk and check in and some more shit.

Milam: On god.

Markell: We just have to find some fliers [runners] really.

Milam: On god. are you coming back tomorrow?

Markell: Yeah, tomorrow night. Monday night.

Milam: Alright bet. Alright well we can do it whenever bro. My bitch is here.

Markell: Alright bet. My bitch is still in the city too.

Milam: Oh rest though, because I need to get a little run first. Once those come [referring to illicit drugs being transported by female runner on bus] I'm going to be good bro.

29

Markell: On god. You already know.

Milam: On god bro. It's good bro. I know I have it, it's just waiting so its good.

Markell: On god. Money in the bank.

Milam: I'm trying to shake it's been hella dry bro, like Not one move.

Markell: I already know. As soon as you get some around, those N** going to be calling.

Milam: Exactly, exactly. Think of something.

Markell: I'm trying bro. I got another little bitch who can grab some more. So you can get off and then double back.

Milam: On god. Bro cuz next time I'm going to grab like, I'm going to grab way more.

Markell: Make it count. Yeah

Milam: I'm about to be, it's about to be.

Markell: You know People trying to go up on N***

Milam: On god.

Markell: You know when it's that ticket [good price for narcotics] you got to get on [buy narcotics in bulk at good price].

Milam: On god put it [money for narcotics] all in.

Markell: On god.

Milam: It's good we are going to figure it out. We will talk in person.

Markell: Alright bet.

57.     Based on my training and experience, I believe Markell Jackson arranged for an unknown female runner to bring controlled substances via a bus from the Phoenix area to Seattle and then the parties discussed using female runners to send illicit drugs in checked luggage on

30

airlines via the "ghost bag" method, discussed above. Markell Jackson discussed in detail how to employ the "ghost bag" method, including finding a female runner and having them check a bag and then leave the airport acting like they have more luggage to check. Markell Jackson admitted to using this "ghost bag" method to traffic narcotics on two prior occasions. Markell Jackson and Milam discussed using this "ghost bag" method in the future once they find female runners to act as "fliers" to check the luggage because they want to take advantage of lower prices of narcotics and buy as much narcotics as they can at the lower prices being offered to Markell Jackson.

58.     On May 5, 2024, Markell Jackson texted Omboga, "soon u get bread put up at crib [Omboga's residence, **Subject Premises**]. We're yo unc don't see." Omboga replied, "yup bae ima lock it up." Based on my training and experience, I believe Omboga is earning prostitution proceeds for Markell Jackson and is storing them at her residence, specifically the **Subject Premises.**

59.     Based on toll analysis of phones used by members of the DTO, investigators believe Kennedy Omboga continues to engage in interstate prostitution activities for Markell Jackson, including collecting and storing prostitution proceeds at the **Subject Premises.** Toll records for TT20 used by Kennedy Omboga shows that she has been in contact with Markell Jackson at his new phone number, (480) 673-9449 (TT30), a total of 19 times from September 11, 2024 to September 19, 2024.  GPS location data for TT20 used by Omboga and TT30 used by Markell Jackson also show that between September 10 and 11, 2024, Markell Jackson and Omboga were co-located, at times, in the Kansas City, MO area and frequented the vicinity of the **Subject Premises** where investigators believe Kennedy Omboga resides based on GPS location data for TT20 and law enforcement database checks, as discussed below.  Also, as

31

discussed more fully below, investigators have surveilled the Omboga going to the **Subject Premises**.

60.     GPS location data for TT20 showed that Omboga travelled to the Dallas, TX area from on or about September 13, 2024 to September 15, 2024, and stayed near the NFL football stadium for the Dallas Cowboys. GPS location data for TT20 showed that Omboga traveled to the Minneapolis, MN area from September 20, 2024 to September 24, 2024, and stayed near the NFL football stadium for the Minnesota Vikings. On both occasions, the Dallas Cowboys and the Minnesota Vikings were playing home games while Omboga was in those cities.  Based on my training and experience, and knowledge of this investigation, I believe Kennedy Omboga is traveling to cities where there are NFL home games to engage in interstate prostitution activities for Markell Jackson. One reason why I believe that Omboga is a prostitute who is working with Markel Jackson is because of Title III wire intercepts of communications between the two that are more fully discussed later in this affidavit, but they indicate a wealthy "John" was coming from Miami to meet with Omboga for sexual favors.  Additionally, as set forth more fully below, investigators on physical surveillance observed Omboga return from Minneapolis by plane on September 24, 2024.  Omboga landed at Kansas City International Airport and drove to the **Subject Premises.** As such, I believe Omboga took to the **Subject Premises** any cash prostitution proceeds she earned while in Minneapolis.

61.     On September 19, 2024, investigators conducted a check of the CLEAR law enforcement database for any residences associated with Kennedy Omboga and observed 253 NW Kessler Dr., Apt 307, Lee's Summit, MO (**Subject Premises**) was associated with Omboga

32

as of April 2024. Specifically, Experian credit information is the source of information that indicates Omboga's address is the **Subject Premises**.

62. On September 24, 2024, investigators observed GPS location data for TT20 used by Kennedy Omboga at the Minneapolis airport. Investigators believe Omboga was returning to the Kansas City, MO area upon completing her interstate prostitution activities associated with NFL home games, as discussed above. Investigators located a flight from Minneapolis to Kansas City under Omboga's name and conducted physical surveillance in the baggage claim area at the time of the flights arrival. Investigators observed Omboga, identified based on a comparison to her driver's license photograph, at Kansas City International Airport. Physical surveillance resources drove ahead of Omboga to the **Subject Premises**, while observing that GPS location data for TT20 was also moving in the direction of the **Subject Premises** without stopping. Investigators observed Omboga arrive at the **Subject Premises,** climb the stairs to the third-floor unit, and a few seconds later the lights turned on in the **Subject Premises.** Accordingly, my investigator-colleagues believe Omboga resides at the **Subject Premises**. Based on this information provided by my colleagues and the other information summarized in this affidavit, I believe that Omboga and uses the **Subject Premises** to store Jackson DTO controlled substances, illicit drug proceeds and Jackson DTO prostitution proceeds.

***Interdiction Stop Showing Harold Butler was a Runner for the Jackson DTO and Subject Premises Occupied by Kennedy Omboga is a Stash House for the DTO.***

63. As set forth above, on or about June 18, 2024, DEA St. Louis/Wichita conducted a controlled purchase of 1,000 fentanyl pills from Harold Butler in St. Charles, Missouri using an undercover officer.

33

64.     On or about July 16, 2024, DEA St. Louis/Wichita agents obtained GPS location data for a phone number used by Butler during that investigation. GPS location data on or about July 17, 2024 showed that Butler was in the Phoenix, Arizona area and was traveling by car towards the Wichita, Kansas area. On July 17, 2024, DEA St. Louis/Wichita agents on physical surveillance located Butler driving in a vehicle in the Wichita, Kansas area and noted that a female associate appeared to be driving a separate vehicle in tandem with Butler. These agents conducted a traffic stop on Butler in the Wichita, Kansas area; Butler provided content to search his vehicle, which was negative for any controlled substances or proceeds, but agents did seize Butler's cell phone.  These agents then conducted a vehicle stop on the female associate who was driving in tandem with Butler. A probable cause search of her vehicle located approximately 80,000 suspected fentanyl pills, and approximately two kilograms of white powder (suspected cocaine or fentanyl).

65.     In September 2024, investigators reviewed the contents of Butler's phone, pursuant to a search warrant. Investigators observed text messages indicating that Butler is the likely uncle to Marquis Jackson and Markell Jackson.

66.     Additionally, investigations observed text messages between Butler and Marquis Jackson and between Butler and Markell Jackson indicating that Butler was overseeing the transport of a drug load for the Jackson DTO at the time of the interdiction stop on July 17, 2024. For example, on July 13, 2024, Marquis Jackson using phone number (945) 261-7501 (TT28) texted Butler: "New number tap in." On July 16, 2024, Marquis Jackson using TT28 texted Butler: "**253 nw kessler dr lees summit mo 64081** (apartment complex for **Subject Premises**)" and "Address to Kell spot in Kc." Marquis Jackson then texted Markell Jackson's TT9 phone

34

number to Butler and told Butler to, "Drop 20 off to cat." Shortly thereafter, Butler texted Markell Jackson at TT9, "this unc I will hit you when pull in tomorrow."

67.     Based on my training and experience, I believe Butler picked up a load of controlled substances in the Phoenix, Arizona area for the Jackson DTO and was transporting this load to the Kansas City, Missouri area with his female associate to be dropped off at Markell Jackson's stash location at the **Subject Premises** with 20,000 fentanyl pills to be dropped off to an unknown individual referred to as "Cat;" however, due to law enforcement's interdiction of Butler, those controlled substances never arrived at the **Subject Premises**. I believe the reference to the **Subject Premises** as "Kell spot" further indicates that this location is not only Omboga's residence but is also used as a Jackson DTO stash house.

68.     During this investigation, investigators have noted a *modus operandi* of Marquis Jackson, Markell Jackson, and the Jackson DTO using females who serve as prostitutes/couriers to move controlled substances and money on behalf of the Jackson DTO, as well as to maintain and live in apartments, which the Jackson DTO uses as stash locations across the country.  To-date, investigators have identified three stash locations of the Jackson DTO, all occupied by female associates of the Jackson DTO.  Specifically, investigators believe the following females are used by the Jackson DTO to store controlled substances and illicit drug proceeds at stash houses: Star Williams in a Phoenix stash apartment, Madelyn Michael in a Dallas stash apartment, and Kennedy Omboga in the **Subject Premises**.

### *Jackson DTO's Use of Star Williams to Occupy a Stash House in Phoenix*

69.     Star Williams established a CashApp account on or about April 26, 2024 with the email star.williams1205@gmail.com and CashTag "kissablekreation."  On May 10, 2024,

35

Jackson DTO member Michael Berry sent $1,000 to Williams with the memo "Rent." On May 13, 2024, Williams sent the same amount back to Berry with the memo "they sent it back." On May 14, 2024, "K. Jackson" sent Williams $1,180 "for rent in AZ." Approximately 30 minutes later, Berry sent $1,000 to Williams. Based on intercepted communications over Mandel Jackson's TT18, emphasized above, investigators believe Marquis Jackson pays for Star Williams's apartment in Phoenix, Arizona and uses it as a stash location for narcotics. For example, following the traffic stop and seizure of 100,000 fentanyl pills from Miracle Jackson and Tyrell Jackson (discussed above), Marquis Jackson was intercepted telling Mandel Jackson, "Yeah, they were supposed to go, she was supposed to go straight to Star's. She wasn't even supposed to look at the work [narcotics], just drop it straight off at Star's." Accordingly, investigators believe the Jackson DTO maintains a stash house in Phoenix and uses Star Williams to occupy that stash apartment.

### *Jackson DTO's Use of Madelyn Michael to Occupy a Stash House in Dallas*

70.     On or about July 2, 2024, GPS location data for TT9 used by Markell Jackson showed he flew to the Dallas area. On or about July 3, 2024, GPS location data for TT18 used by Mandel Jackson showed he flew to the Dallas area. On or about July 4, 2024, GPS location data for TT21 used by Keondre Jackson showed his location overlapping with known Phoenix source of supply Edgar Valdez in Phoenix and then Keondre Jackson flew to Dallas on July 5, 2024. GPS location data for Markell Jackson, Mandel Jackson, and Keondre Jackson showed they were co-located frequently in the vicinity of 1601 Elm Street, Apt #2006, Dallas, TX.

71.     On or about July 6, 2024, GPS location data for these subjects showed they traveled by vehicle to the Kansas City area. On or about July 9, 2024, GPS location data for

36

TT21 used by Keondre Jackson showed he was back in the vicinity of 1601 Elm Street, Apt #2006, Dallas, TX. On July 9, 2024, at approximately 2:31 p.m., investigators on physical surveillance observed a male matching the driver's license photograph of Keondre Jackson walk into the front lobby of the building for 1601 Elm Street, Apt #2006, Dallas, TX around the same time that GPS location data for TT21 put him in the vicinity. That same day, investigators on physical surveillance approached the building security and showed them the driver's license photograph of Keondre Jackson, and building security stated they recognized Keondre Jackson as a guest who frequents a unit in the building.

72.     Flight records and a search of the CLEAR law enforcement database showed Madelyn Michael was associated with 1601 Elm Street, Apt #2006, Dallas, TX.

73.     As set forth above, investigators obtained a search warrant from the Western District of Washington for content stored in the iCloud account of Markell Jackson associated with TT9. Upon review of Markell's iCloud account, investigators located the following text message conversation on May 23, 2024 between Markell Jackson at TT9 and Marquis Jackson at TT26:

Marquis: U can pick ur money and work [narcotics] from Dallas maddy will be here wit it

Markell: u leavin tn

Marquis: Tommaro

Markell: yup take my cake w u

Marquis: To Miami?

Markell: Ya Miami

37

Markell: How much he gon charge fr plain rollie

Marquis: 35 prolly

Marquis: Yellow ?

Markell: Ez we can grab kilos too get cheaper

74.     Based on my training and experience, I believe Marquis Jackson advised Markell Jackson that Markell could pick up stashed narcotics and narcotics proceeds at Madelyn Michael's place in Dallas.  I further believe Markell told Marquis to take his narcotics proceeds to Miami and then the parties discussed purchasing additional narcotics with that money from an unknown person in Miami and questioning whether the price of one narcotic (possibly counterfeit Xanax bars based on the reference to the color yellow) would be lower if they also purchased kilograms of another type of narcotic.

75.     As set forth above, investigators seized Harold Butler's cell phone from the interdiction stop in the Wichita, Kansas area on or about July 17, 2024.  Investigator's review of the contents of Butler's phone, obtained via a search warrant, showed a pin drop at the location of 1601 Elm Street, Apt #2006, Dallas, TX on May 9, 2024 sent by Butler to an unknown male using phone number (316) 992-4233 (saved in Butler's contacts as "Law").  That same date, Butler has text messages with "Law" as follows before sending this pin drop:

Butler: ETA?

Law: 2 ish

Law: Still 2 drops right

Butler: Yes

Butler: I'm in Dallas so hit me

38

[***]

Law: 76 miles out

Butler: Bet

Law: 30 minutes

Law: Touchdown cowboys

Law: What's the move

Butler: texted pin drop to hotel in Dallas

Butler: texted pin drop to building of 1601 Elm Street, Dallas, TX

Law: I've arrived

76.     Based on my training and experience, I believe this unknown male referred to as "Law" was transporting illicit drugs and was going to make two drops, or deliveries, of those drugs and was coordinating with Butler in Dallas for one of those drug drops.  I believe "touchdown" is a common term used to indicate a person has arrived and that the reference to "cowboys" indicated that "Law" had arrived in the Dallas area and was looking for a specific place to go with the narcotics load. I believe this drug drop occurred at the Dallas stash apartment based on Butler texting a pin drop location for this stash location after initially sending a location to a nearby hotel.  Lastly, I believe "Law" is an unidentified member of the Jackson DTO based on other text messages in Butler's phone, including a text message with Keondre Jackson on June 1, 2024 where Keondre asked Butler: "Pop what's law number."  Butler sent the contact information for Law to Keondre; Keondre then texted, "his [Law's] phone is going straight to voicemail," and Butler replied, "He on road."  Based on my training and experience, I believe Keondre Jackson attempted to call "Law" at the phone number provided by Butler, but

39

Law did not answer. Butler then advised Keondre Jackson that Law was on the road, likely transiting other narcotics.

77. Accordingly, investigators believe this Dallas stash apartment that was occupied by Madelyn Michael at the time was another narcotics and narcotics proceeds stash location used by the Jackson DTO, including by Markell Jackson, Marquis Jackson, Harold Butler, and Keondre Jackson, and Madelyn Michael.

## KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

78. Based upon my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know the following:

a. Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed (pay-owe sheets), telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes, vehicles, storage lockers, and businesses.

b. Traffickers of controlled substances commonly maintain records reflecting names or nicknames, addresses, and/or telephone numbers of their suppliers, customers, and associates in the trafficking organization. Traffickers commonly maintain this information in books or papers as well as in their cellular telephones. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing drug trafficking. Traffickers often change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

40

c.      Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences, vehicles, and storage lockers.  This evidence often includes not only contraband and paraphernalia, but also financial records, records of property and vehicle ownership, records of property rented, and other documentary evidence relating to their crimes.  Drug traffickers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product.  These individuals often maintain these photographs and recordings in their possession or at their premises.

d.      During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings which show ownership, dominion, and control of vehicles, residences, and/or storage units.

e.      Persons trafficking and using controlled substances commonly sell or use more than one type of controlled substance at any one time.

f.      Traffickers frequently maintain items necessary for weighing, packaging, and cutting drugs for distribution.  This paraphernalia often includes, but is not limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of drugs.

g.      It is common for drug dealers to also be users of their product, and that it is common for the drug user to maintain paraphernalia associated with the use of controlled substances.

h.      Traffickers frequently maintain records, books, notes, ledgers, travel documents, and other papers relating to the transportation and distribution of controlled substances, including travel records, in locations convenient to them, such as their residences and vehicles.

41

i.      Traffickers frequently keep on hand amounts of United States currency in order to maintain and finance their ongoing narcotics business.  They commonly deal in currency because of its untraceable nature.  They sometimes convert their illicit currency into currency equivalents such as cashier's checks and money orders.  Traffickers often conceal in secure locations such as their residences and vehicles currency, financial instruments, precious metals, jewelry, and other items of value which are the proceeds of drug transactions, and evidence of consequential financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities, and financial books, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, and other records showing the management of such assets.  Traffickers often have money counters.

j.      Traffickers often maintain weapons, including guns, ammunition, and body armor, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

k.      Traffickers often have false identification documents and identification documents in the names of others in order to conceal their identities.

l.      Traffickers very often place assets in names other than their own, or use fictitious names and identification, to avoid detection of these assets by government agencies.  Even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

m.      Illegal drug trafficking is a continuing activity over months and even years. Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat

42

regular basis, much as any distributor of a legitimate commodity would purchase stock for sale and, similarly, such drug traffickers will have an "inventory" which will fluctuate in size depending upon various factors to include the demand and supply for the product. I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money. These records are often created in code.

79. As noted above, drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. Since cellular phone use became widespread, every drug dealer I have contacted has used one or more cellular telephones for his or her drug business. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. Lastly, I know that traffickers commonly upload or otherwise transfer their data, messages, photographs, and other communications from one phone to another when changing cell phones, because they want to

43

maintain contact with their customers and to retain other information about their trafficking business.

80.     Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes.  This includes the following:

a.     The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone.  This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source or was intercepted on a wiretap here or in another district.

b.     The stored list of recent received calls and sent calls is important evidence. It identifies telephones recently in contact with the telephone user.  This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors, and customers, and it confirms the date and time of contacts.  If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide

44

information about the user. Identifying a target's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

c. Stored text messages, emails, and any social media content/messages (like Facebook messenger) are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d. Photographs and video recordings on a cellular telephone, including metadata, are evidence because they help identify the user, either through his or her own picture/video, or through pictures/videos of friends, family, and associates that can identify the user and the locations the user has been. Pictures/videos also identify associates likely to be members of the drug trafficking organization. Some drug dealers photograph/video groups of associates, sometimes posing with weapons and showing identifiable gang signs. Also, digital photos often have embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

e. Stored web browsing history is important evidence because it shows the user's activities and places of interest, including if the user looked up addresses, restaurants, and other businesses on a web browser on the cell phone, which can show where coconspirators meet, where they travel, and where assets might be located. Moreover, through web browsing history, a user can also access or look up associates or coconspirators on social media, which is valuable

information in a drug investigation because it will identify members of the organization, such as suppliers, distributors and customers.

f.     Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

g.     Stored data in money transfer applications, such as Venmo and CashApp, are important evidence because they show from whom and to whom the user is sending money.  In the era of digital currency and online money transfers, I know based on my training and experience, and intercepted communications during this investigation that drug traffickers, and specifically drug traffickers within the Jackson DTO, use Cash App and other money transfer applications to pay for drug products in lieu of physical cash.  Accordingly, any stored data on money transfer applications on cell phones can show the user's drug trafficking associates, customers, and other connections.

h.     Stored location data, including from any map applications on the cell phone, are important evidence because the data can show where the user has been, including addresses of residences and business parking lots, which can show stash house locations, drug transaction meeting locations, or the addresses of a drug trafficker's associates, customers, or suppliers.

### DIGITAL DEVICES AND FORENSIC ANALYSIS

81.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, and/or instrumentalities that might be found at the **Subject Premises**, in whatever form they are found.  One form in which the evidence, fruits, and/or instrumentalities might be found is data stored on digital devices, including cellular telephones.

46

Thus, the requested warrant would authorize the seizure of digital devices found in the **Subject Premises** and potentially, the copying of electronically stored information from digital devices, all under Rule 41(e)(2)(B).

82.     Based upon my review of the evidence gathered in this investigation, my review of data and records, information received from other agents and computer forensics examiners, and my training and experience, I submit that if a digital device is found at the **Subject Premises**, there is probable cause to believe that evidence, fruits, and/or instrumentalities of violations of the Target Offenses, and related offenses will be stored on those digital devices.

83.     Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrants I am applying for will permit seizing, imaging, or otherwise copying the digital devices that reasonably appear capable of containing some or all of the data or items that fall within the scope of Attachment B to this Affidavit, and will specifically authorize a later review of the media or information consistent with the warrant.

84.     Consistent with the above, I hereby request the Court's permission to seize and/or obtain a forensic image of digital devices that reasonably appear capable of containing data or items that fall within the scope of Attachment B to this Affidavit, and to conduct off-site searches of the digital devices and/or forensic images, using the following procedures:

*A.*     *Processing the Search Sites and Securing the Data.*

85.     Upon securing the physical search site, the search team will conduct an initial review of any digital devices located at the **Subject Premises** described in Attachment A that are capable of containing data or items that fall within the scope of Attachment B to this Affidavit, to

47

determine if it is possible to secure the data contained on these devices onsite in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

86.     In order to examine the electronically stored information ("ESI") in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of any digital device that is capable of containing data or items that fall within the scope of Attachment B to this Affidavit.

87.     A forensic image may be created of either a physical drive or a logical drive. A physical drive is the actual physical hard drive that may be found in a typical computer. When law enforcement creates a forensic image of a physical drive, the image will contain every bit and byte on the physical drive. A logical drive, also known as a partition, is a dedicated area on a physical drive that may have a drive letter assigned (for example the c: and d: drives on a computer that actually contains only one physical hard drive). Therefore, creating an image of a logical drive does not include every bit and byte on the physical drive. Law enforcement will only create an image of physical or logical drives physically present on or within the subject device. Creating an image of the devices located at the **Subject Premises** described in Attachment A will not result in access to any data physically located elsewhere. However, digital devices at the **Subject Premises** described in Attachment A that have previously connected to devices at other locations may contain data from those other locations.

88.     If based on their training and experience, and the resources available to them at the search site, the search team determines it is not practical to make an on-site image within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data,

48

then the digital devices will be seized and transported to an appropriate law enforcement laboratory to be forensically imaged and reviewed.

**B.      Searching the Forensic Images.**

89.      Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant.  The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.  Those techniques, however, may necessarily expose many or all parts of the data on the digital devices to human inspection in order to determine whether it contains evidence described by the warrant.

**C.      Past Efforts to Obtain Electronically Stored Information**

90.      Because of the nature of the evidence that I am attempting to obtain and the nature of the investigation, I have not made any prior efforts to obtain the evidence based on the consent of any party who may have authority to consent.  I believe, based upon the nature of the investigation and the information I have received, that if Marquis Jackson, Markell Jackson, Keondre Jackson, or Madelyn Michael become aware of the investigation in advance of the execution of a search warrant, they may attempt to destroy any potential evidence, whether

49

digital or non-digital, thereby hindering law enforcement agents from the furtherance of the criminal investigation.

## **CONCLUSION**

91.    I submit that this affidavit supports probable cause for a warrant to search the **Subject Premises** described in Attachment A and seize the items described in Attachment B.


Respectfully submitted,

Special Agent Shawna McCann
Federal Bureau of Investigation


Agent sworn and signature confirmed via reliable electronic means, pursuant to Fed. R. Crim. P. 41(d)(3) on October <u>1st</u>, 2024.   Sworn to by telephone
2:35 PM, Oct 1, 2024



HONORABLE LAJUANA M. COUNTS
UNITED STATES MAGISTRATE JUDGE